UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
                                                                        :
UNITED STATES OF AMERICA                                                :
                                                                        :     S1 16 Cr. 212 (LAK)
                        - v. -                                          :
                                                                        :
DAMON PARRISH,                                                          :
                                                                        :
                                Defendant.                              :
                                                                        :
------------------------------------------------------------------------X

**SENTENCING MEMORANDUM OF THE UNITED STATES OF AMERICA**

 

 

PREET BHARARA
United States Attorney
Southern District of New York
One St. Andrew's Plaza
New York, New York 10007

RACHEL MAIMIN
MICAH W.J. SMITH
HAGAN SCOTTEN
JESSICA FEINSTEIN
DREW JOHNSON-SKINNER
Assistant United States Attorneys
   - Of Counsel -

```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
                                                              :
UNITED STATES OF AMERICA                                      :
                                                              :    16 Cr. 212 (LAK)
                      - v. -                                  :
                                                              :
DAMON PARRISH,                                                :
                                                              :
                                    Defendant.                :
                                                              :
------------------------------------------------------------------------X
```

## PRELIMINARY STATEMENT

The defendant in this case, Damon Parrish ("Parrish"), is scheduled to be sentenced on November 15, 2016. The Government respectfully submits this memorandum in advance of that sentencing and in response to Parrish's sentencing memorandum, dated November 9, 2016, which requests a sentence of time served, which amounts to less than 6 months' imprisonment—a significant downward variance from the United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") range of 37 to 46 months' imprisonment. For the reasons that follow, the Government disagrees and respectfully requests that the Court impose a sentence within the Guidelines range. Parrish was a wholesale marijuana supplier to his son, Laquan Parrish ("Laquan"), one of the of leaders of a violent street gang: the 2Fly YGz ("2Fly" or the "Gang"). Parrish also shared a loaded gun with Laquan—a violent gangster with a history of shootings—which was seized at the time of Parrish's arrest in this case. A sentence of less than 6 months' imprisonment would be utterly insufficient to meet the statutory sentencing factors, especially the need for just punishment, to reflect Parrish's history and characteristics, and to afford adequate deterrence to criminal conduct. A sentence within the Guidelines range is necessary to

send the message that supplying drugs to—and storing guns for—a violent street gang is a serious offense that merits significant jail time.

I.   **Procedural History**

On April 27, 2016, the S1 Indictment in this case was unsealed, charging 57 members and associates of 2Fly with: (1) racketeering conspiracy, in violation of Title 18, United States Code Section 1962; (2) narcotics conspiracy, in violation of Title 21, United States Code, Sections 841(a)(1), 841(b)(1)(A), and 846; (3) narcotics distribution, in violation of Title 21, United States Code, Section 860; and/or (4) firearms discharge, in violation of Title 18, United States Code, Section 924(c)(1)(A)(iii).

On July 25, 2016, Parrish pled guilty to the lesser included conduct charged in Count Two of the S1 Indictment in this case, *i.e.,* narcotics conspiracy, in violation of Title 21, United States Code, Sections 841(a)(1), 841(b)(1)(C), and 846. (PSR ¶ 8.)

II.   **Offense Conduct**

   A.  Background

Beginning in December 2014, the New York City Police Department, the Drug Enforcement Administration, Homeland Security Investigations, and the Bureau of Alcohol, Tobacco, Firearms, and Explosives conducted an investigation into two rival street gangs—2Fly and the Big Money Bosses ("BMB")—that were operating in the Bronx, New York.  The investigation revealed that since at least in or about 2007, up until in or about 2016, members of BMB and 2Fly were involved in a variety of racketeering acts, including murders, attempted murders, robberies, narcotics trafficking, bank fraud, and counterfeit currency offenses.

   B.  2Fly

The structure of 2Fly is described accurately in the PSR at paragraphs 11-23.

2

2Fly was a subset of the "Young Gunnaz," or "YG" street Gang, which operates nationwide.  2Fly was based in the Bronx, within and around the Eastchester Gardens housing development ("ECG"), and developed out of a smaller, precursor crew called the "Fresh Kids."  ECG is a rectangular complex of residential buildings in the Northern Bronx bordered by Burke, Adee, Yates, and Bouck Avenues, in the middle of which is a playground.  Laquan was one of the leaders of 2Fly.

Members of 2Fly controlled the narcotics trade at ECG, which took place in the open air at the playground and in apartments at ECG.  Members primarily sold marijuana and crack cocaine, but also sold powder cocaine and prescription pills, such as oxycodone.  2Fly coexisted at ECG with a faction of the Bloods Gang called "Sex Money Murder" ("SMM"), which controlled ECG before 2Fly and allied with 2Fly to prevent others from selling drugs at ECG.  Members of the Gang kept guns nearby in garbage cans—feet away from the playground—or in cars in case such violence becomes necessary.  These guns were accessible to all 2Fly members and associates. On February 22, 2014, for instance, 2Fly member Elijah Brown, a/k/a "Lil Eli," was arrested after he was seen by police officers retrieving a defaced and loaded gun from behind a garbage can at ECG.  Similarly, 2Fly member Dante Gregory, a/k/a "Smiley," was arrested at the ECG playground on April 8, 2014 with a loaded .25 caliber handgun.

2Fly members used relatively elaborate language to communicate with each other, including "peacing" each other using particular words that, if not used properly, could indicate that a person is falsely claiming to be a member (which could lead to violence). There was no formal ceremony to join the Gang, but a young man who sought to join must have generally brought his "resume" of acts of violence in order to gain admission.

In addition to its narcotics trafficking, 2Fly members and associates engaged in acts of violence, including shootings, stabbings, robberies, and gang assaults. Members who engaged in a sufficient amount of violence could earn a leadership position, the highest of which were called "Big Guns." Members who "have the Big Gun" were permitted to recruit others into the Gang and order acts of violence.

Members of 2Fly bragged about the Gang and their narcotics trafficking and violence on social media sites, such as Facebook and YouTube. Briefly, by way of example, in a video entitled "Maddog, Bay Kay & Slimmy- Bang Bang," which was uploaded onto YouTube, 2Fly member Bowlin Wallingford, a/k/a "BK," a/k/a "Bay Kay," performs a rap song. During the video, Wallingford states, in substance and in part, that he is "being a brick pusher," which is a reference to distributing significant quantities of cocaine or crack cocaine. Wallingford also raps, in substance and in part, "with my gun unit behind me, ain't no way you can stop me," which is a reference to members of 2Fly who carry firearms in furtherance of 2Fly drug trafficking. At a different portion in the video, 2Fly member Sean McIntosh, a/k/a "Slimmy," raps that "Bay Kay on his cell, he's probably doing the chop now," which is a reference to Wallingford's preparation of cocaine into crack cocaine for sale, and his use of his cellphone to receive calls from narcotics customers. Similarly, in a video uploaded onto YouTube where McIntosh is the main rapper entitled "My Shootaz, Slimmy," the first shot is a graphic of the city skyline with the words "2Fly City" underneath it. During the video, McIntosh states, among other things: "2 Fly, 2Fly, Nigga, I got much respect for my shooters," and features an unidentified male holding a gun. McIntosh also states: "I'm YG." Facebook postings and rap videos were not merely for show, however; they represented a way for rival gangs to communicate with each other and thereby inflamed gang rivalries.

Many of the acts of violence related to the longstanding rivalry between BMB and 2Fly. 2Fly also has developed rivalries with other street gangs in the northern Bronx, including the "Slut Gang" based in the Boston-Secor housing development. Among other things, 2Fly members developed a practice of going "mobbing," meaning to gather in large groups and travel to the base of operations of a rival Gang to engage in violence there. Members of rival Gangs also sometimes went "mobbing" and attacked or attempted to attack 2Fly at its base of operations at ECG. The relatively close proximity of the BMB and Slut Gang bases contributed to the frequency of acts of violence.

### C. Parrish's Role with the Gang

Parrish was not a member of 2Fly, but he assisted the Gang by sharing a loaded revolver with his son, Laquan, one of the leaders and most violent members of the Gang, and by supplying Laquan with marijuana for resale. Parrish and Laquan shared a close criminal relationship, during which Parrish kept close tabs on his son's drug dealing and even pressured his son to be a more effective drug dealer.

In particular, Parrish and Laquan were intercepted on a judicially-authorized wiretap of Laquan's telephone discussing their drug business. On March 9, 2016, Parrish asked Laquan: "How far are you?" Laquan responded: "Like . . . eight, eight, eight and some change right now," meaning that he had 8 ounces of marijuana left to sell. Parrish expressed frustration with the pace at which Laquan was selling the marijuana: "If this is taking you that long, how, how you going to do a whole, man," *i.e.,* how long would it take for Laquan to sell a whole pound of marijuana. On March 11, 2016, Laquan said to Parrish: "There are people out there that got more than me, that's why I asked for what I asked for the first time, so I could put all the competition out." Laquan was explaining to Parrish that he was trying to obtain more drugs than

5

his competitors, and that was why he had asked Parrish for a certain quantity of drugs. Laquan assured Parrish that "I'm working every day."  Parrish responded: "Okay, alright."

Wiretap recordings also demonstrate Parrish's awareness that the purpose of the gun he stored for Laquan was to commit violence. As detailed below, law enforcement officers intercepted a series of calls in which Laquan asked Parrish for the gun, which Parrish agreed to provide.  Indeed, Parrish's only hesitation for giving his gang-leader son a gun was that the gun was too big to be carried in public.

Specifically, on March 11, 2016, Laquan asked Parrish if "that joint in the crib still?" meaning that he wanted to know if the gun was still in Parrish's house.  Parrish responded: "What you want that for man?"  Parrish explained that "Somebody playing with me, somebody playing with me right now. Niggas are playing with me man," and that "I'm missing two hundred cash," *i.e.,* Laquan wanted the gun because someone stole $200 from him.  Parrish said: "No, don't fuck with that. You don't know what you're doing with that one."  After Laquan insisted that he "need that," Parrish told his son that "It's too big for you man," and "that shit is too big to be walking around with," meaning that the gun was too large to carry in public. Parrish declined to tell his son where the gun was located.

A few days later, on March 17, 2016, Laquan called his father again asking if he could "use your joint for the night," meaning Parrish's gun.  Parrish responded: "What joint?"  Laquan reiterated: "I need to use your joint for the night, man."  Parrish agreed to loan the gun, saying: "[SIGHS] There's no . . . alright, go ahead."  Laquan said: "I'm good money, you don't have to . . . come on, you don't have to do all that.  I am good money," meaning that his father did not have to worry.  The next day, Laquan called Parrish to report that he would need a resupply of drugs shortly.  Parrish then asked: "You take the, you take the other thing, right?" Laquan said:

6

"What that, talk to . . . the other thing?  Uhm . . . what are you talking about?  Yeah . . . wait, hold on, you got me confused right now."  Parrish responded: "The thing you took from the house," referring to the gun that Laquan had borrowed from Parrish.  Laquan replied: "Yeah, I got . . . What do you mean? Of course."  Parrish replied: "Alright."

Parrish's possession of a large gun was confirmed on the day of his arrest in this case.  Pursuant to a search warrant of Parrish's house, law enforcement agents recovered a large .357 caliber Smith & Wesson revolver in a kitchen cabinet, along with nine rounds of .357 ammunition, 34 rounds of 9 mm ammunition, and 9 rounds of .380 ammunition.  (A photograph of the firearm and ammunition is attached hereto at Exhibit A.)  Parrish admitted that he did not have a license for the gun.  Further, sometime after the April 27, 2016 takedown, a cooperating witness overheard a conversation at the jail in which Parrish and Laquan discussed that there was "nothing on the gun," meaning that the gun had not been used in a crime that could be traced back to them.

The Government also notes that, according to the wiretap recordings, Parrish was aware that Laquan was on parole, and that his parole officer was looking for him, at the same time that Parrish was supplying Laquan with wholesale marijuana and a gun.

## II.   The Defendant's Criminal History

Parrish has no prior criminal convictions.  However, Parrish was arrested on multiple occasions in the early 1990s, including an arrest for "dangerous drugs" on December 11, 1990, and an arrest for a felony assault on March 14, 1990.

7

**III.   The PSR and Guidelines Calculation**

In keeping with the plea agreement between the parties, the PSR calculates the defendant's total offense level as 21.  In Criminal History Category I, Parrish's sentencing Guidelines range is 37 to 46 months' imprisonment.

### 3553(a) ARGUMENT

For the reasons that follow, a sentence within the Guidelines range is necessary to meet the statutory sentencing factors, in particular to provide just punishment, reflect Parrish's history and characteristics, and afford adequate deterrence to criminal conduct.

Parrish was not a member of 2Fly, but he aided one of the leaders of the Gang by providing him with wholesale drugs and a loaded gun for the purpose of getting revenge after a perceived drug theft.  The fact that the leader Parrish aided was his own son is extremely troubling.  While Laquan is an adult and responsible for his own crimes, a father is supposed to be a role model for his son—not a drug and gun supplier.  The Court should consider Parrish's toxic and criminal relationship with his own son in considering Parrish's history and characteristics.  In that regard, the Government notes that the illegal, loaded revolver seized in this case was kept by Parrish in a kitchen cabinet in a home he shared with his infant son and 16-year-old daughter. (PSR ¶¶ 73.)

Parrish asks for a downward variance to time served and probation, which would amount to a term of imprisonment of less than 6 months.  However, Parrish has not put forth any legitimate bases for a variance of any kind.   For instance, Parrish points to his older age and history of employment.  But he was already middle-aged and employed while he committed this offense.  Therefore, there is no reason to believe that, just a few months later, Parrish will somehow have "aged out" of criminal behavior.  In addition, Parrish has already received a

benefit by virtue of his plea agreement, which did not require him to plead guilty to an offense with a mandatory minimum sentence—much less the firearms offense, which carried a mandatory minimum and consecutive sentence. Under the circumstances of this offense, no further leniency is necessary.

With respect to the question of specific deterrence, the Government notes that Parrish merits particular credit for acceptance of responsibility; he pled guilty very early in the case, saving judicial and Governmental resources and indicating that he may intend to change his ways. Although it is reasonable to take the timing of Parrish's plea into account in fashioning his sentence, that does not mean that a downward variance from the Guidelines range is merited. It is important to send the message of general deterrence that providing drugs and guns to violent street gangs—and thereby fueling those gangs—is a serious offense that warrants significant jail time.

Finally, the Government notes that the sentence Parrish requests—time served and probation—is not legal under the circumstances of this case. In particular, pursuant to Title 18, United States Code, Section 3561(a)(3), a term of probation may not be imposed if "the defendant is sentenced at that same time to a term of imprisonment for the same or different offense that is not a petty offense." 18 U.S.C. § 3561(a)(3). Because Parrish's six months of time served is a "term of imprisonment," the Court cannot impose time served and probation in this case. If the Court wanted to impose time served and a period of judicial supervision, it would have to impose a period of supervised release.

**CONCLUSION**

For the foregoing reasons, the Government respectfully requests that the Court impose a sentence within the range of 37 to 46 months.

Dated: New York, New York
November 10, 2016

Respectfully submitted,

PREET BHARARA,
United States Attorney for the
Southern District of New York,

By: __/s/_____
Rachel Maimin
Micah W.J. Smith
Hagan Scotten
Jessica Feinstein
Drew Johnson-Skinner
Assistant United States Attorneys
(212) 637-2460

10