## RICHARD PALMA
ATTORNEY AT LAW
11 PARK PLACE - SUITE 1715
NEW YORK, NEW YORK 10007

**MEMBER OF THE BAR**  **TEL. (212) 686-8111**
**NEW YORK & FLORIDA**  **FAX. (212) 202-7800**
E-MAIL: rpalma@verizon.net

July 5, 2017

**ECF Filed**

Honorable Lewis A. Kaplan, U.S.D.J.
United States Courthouse for S.D.N.Y.
500 Pearl Street
New York, N.Y. 10007

> *Re:  United States v. Preston Pasley, Dkt. No. S1 16 Cr. 212 (LAK)*
> *Preston Pasley requests a variance of forty-one months imprisonment in accordance with 18 U.S.C. §3553(a).*

Dear Judge Kaplan:

I write in support of Mr. Preston Pasley's July 19, 2017 sentencing for Racketeering Conspiracy. For reasons stated below, we respectfully request a variance of forty-one months incarceration in accordance with the sentencing principles of **18 U.S.C. §3553(a)**.

### Pasley's Personal History & Characteristics

At seventeen, Pasley joined a street gang, *Sex, Money, Murder* ("SMM"), based in the Eastchester Gardens public housing complex in the Bronx neighborhood where he grew up. Why he chose to join a gang, father children as a teenager, and sell and abuse drugs, requires knowing who raised him, why they failed him, his living conditions, and the people who most influenced him.

Case 1:16-cr-00212-LAK   Document 1118   Filed 07/05/17   Page 2 of 13

Page 2
Letter to Hon. Lewis A. Kaplan, U.S.D.J.
July 5, 2017

Raised in a dysfunctional family where his mother was a crack addict and marijuana dealing was his father's main means of supporting himself and children, Pasley by age seventeen was himself was selling marijuana and crack cocaine on the streets surrounding Eastchester Gardens, something he did recurrently until age twenty-six.

While his mother ultimately abandoned them because of her addiction, after their parents separated Pasley and his brother, Terrence, lived with her first in a homeless shelter and eventually in an apartment.  Pasley has no recollection of his mother ever holding down a job, but remembers, among other things, that she was "in and out of jail" and that she left them alone for extended periods presumably while she hustled to get high or was incarcerated.  When incarcerated her live-in boyfriends would be the brothers' principal "caretakers".   Another of Pasley's earliest memories is being introduced to alcohol and marijuana as a four-year-old by one of these men.  Having been coerced to consume controlled substances as a preschooler doubtlessly contributed to his teenaged marijuana dependency and opioid addiction in his twenties.

When their father chanced upon one of these "caretakers" strolling down the street with his sons, who could not satisfactorily explain what he was doing with the children, he invoked street justice by forcibly taking custody of the five-year-old Pasley and his brother.  The pair remained with their father and his paramour until Pasley turned sixteen. Pasley last saw his inebriated mother by chance on a Bronx street corner in 2014/2015 where she greeted him warmly before she resumed standing on the corner with other addicts.

Although his father's drug dealing permitted him to financially support the brothers, he was emotionally distant from the boys.  Pasley oftentimes felt unwelcomed in his home and unloved.  His brother Terrence's bad behavior would often provoke their father's rage resulting

in cruel diatribes against their mother and them. Preferring homelessness to abuse, Pasley left at age sixteen. This was the second time in Pasley's life when he was homeless.

However, Terrence's release from prison a year later prompted a temporary family reunion under their father's roof. Recruited by Terrance, it was in this period that Pasley joined SMM. Soon after they began selling drugs with SMM members, the brothers were arrested on drug charges after an NYPD raid of their father's residence. After serving his ninety days'sentence for a misdemeanor drug possession charge, Pasley returned to his father's home but opted again for homelessness a few months later.

Without a permanent home, Pasley lived with friends or his paternal grandmother who likewise lived in Eastchester Gardens. He attended Truman High where he was enrolled in several honors classes, but he dropped out in ninth grade in response to the mockery he suffered from fellow students for his desire to excel in school. Pasley said he felt "self-conscious." With his grandmother's help, he did, however, earn a GED in 2009 through the Abyssinian Development Corporation ("ADC"), where he also earned a certificate in commercial painting and for whom he renovated buildings.

SMM membership and drug dealing notwithstanding, his achievements at ADC demonstrate that Pasley did strive to forge a life within the law. As reported in the PSR, he found employment with *Art Guild Plaques & Trophies*, located near Eastchester Gardens, assembling trophies and engraving plaques and even commuted to White Plains for a period just to pump gas and cashier. In the end, however, these menial "off the books" jobs were insufficient to enable him to support his children. He eventually found employment as a program aide at a Jerome Avenue women's shelter. He left this job at age twenty-one when encouraged by family

living in Durham, North Carolina to move south to make a new start for himself. When he lived in Durham 2011 – 2013 he was no longer selling drugs with SMM.

When he learned he could earn livable wages in Durham assembling Toyota transmissions, he convinced his oldest child's mother to allow their son to live with him. That reunion lasted six months. When that concern, *Staffmasters*, fired him, he then joined a moving company. He lost that job too. With the return of his son to New York and no success in finding another job in Durham he decided to return to the Bronx where he found work at *Art Guild Plaques & Trophies* (2013 – 2015) before returning to drug dealing.

As also reported in the PSR, he suffered a serious gunshot injury outside a bar in January 2016 as the victim of a robbery attempt. ¶ 125. A group of as-yet-unapprehended strangers surrounded him, punched him in the mouth then shot him in the leg, precipitating two surgeries and replacement of his right knee. **Id.** He walks with a limp. .

Pasley denies neither his SMM membership, nor his crack distribution or his firearm possession. He does, however, object to that much of the PSR as concludes that he supplied drugs to Laquan Parrish, the leader of the *2Fly* gang. ¶67.

Following his father's example, Pasley has historically supported himself and his three out-of-wedlock children by dealing drugs. But also following his father's footsteps further, he seeks redemption by trying to overcome his drug abuse and dealing and live a productive life. As reported in the PSR, his father now lives out of state and is employed as a phlebotomist at a hospital. His grandmother describes Pasley as quiet, smart and caring. ¶ 123, and further says, "…he wants to change his life so that he can be there for his children". **Id.** Pasley is determined

to make these changes happen.  While imprisoned Pasley has successfully completed the BOP's *Nonresidential Drug Abuse Program*. See, attached Certificate of Completion.

### Objections to the PSR.

Mr. Pasley has no objection to the PSR's guidelines calculation which are explained below, but he objects to ¶ **67,** the factual finding that he supplied drugs to Laquan Parrish.

### Terms of Plea Agreement & PSR Guidelines Calculation

Pasley pleaded guilty by way of a plea agreement to Count One, *Racketeering Conspiracy*, in violation of 18 U.S.C. § 1962 (c). The agreement stipulates his *"pattern racketeering activity"* was conspiring to distribute cocaine base. **See, Government Plea Agreement, p. 1**.  For guidelines purposes, the parties stipulated that Pasley is responsible for distributing between 196 but lower than 280 grams of cocaine base, that he warrants a 2-level enhancement for possession of a firearm, and an additional 2-level enhancement for role. **Id. at p. 2.**  According to the agreement the Total Offense level is 29 *after* adjusting for acceptance of responsibility (-3) and the Criminal History Category is II based on his above described NYS 2007 misdemeanor drug possession suffered at age seventeen. **Id. at p. 3.**  Under the agreement, his sentence range is 97 to 121 months imprisonment. **Id.**

Factoring in the above enhancements Probation further penalizes him 2 more criminal history points for a NYS 2006 robbery conviction suffered at sixteen years old for which he received a Youthful Offender Adjudication and was sentenced to probation, and 2 more criminal history points for participating in the instant racketeering conspiracy while on probation as a

teenager. **PSR ¶¶ 103 & 106**.[1] Because the guidelines mandate that these convictions be accounted for, regardless of age, Probation finds that his Criminal History Category is III which elevates his guideline range to 108 – 135 months. **See, PSR p. 37 & ¶¶ 103, 104, 106.** It recommends the bottom of the range, 108 imprisonment. **Id.**

## ARGUMENT

### Point No. 1
### A Guidelines Sentence Overstates the Seriousness of Pasley's Criminal History.

Prohibited by the plea agreement from seeking a departure, **Plea Agreement at p. 3,** Pasley relies on Second Circuit guidelines departure law here solely to expose an inconsistency in the Racketeering guidelines treatment of a "prior sentence" and to advance his argument for a variance of 41 months incarceration.

The general rule in calculating criminal history points under the guidelines is to disregard prior criminal convictions that are part of the instant offense. **See, §4A1.2(a)(1). Id.** (*"The term 'prior sentence' means any sentence previously imposed … <u>for conduct not part of the instant offense.</u>"*)(**underline added**).  See also §4A1.2, comment. (n. 1) (*"'Prior sentence' means a sentence imposed prior to sentencing on the instant offense, <u>other than a sentence for conduct that is part of the instant offense.</u>"*)(**underline added**); **U.S. v. Thomas**, 54 F.3d 73, 83 (2d Cir. 1995)(**a prior sentence for purposes of computing CHC means any sentence imposed <u>that is not part of the instant offense</u>**)(**underline added**).

---

[1] As reported in the PSR, Pasely's probation sentence was revoked and he was resentenced to 8 months imprisonment on October 5, 2009.  **¶ 103.**

Page 7
Letter to Hon. Lewis A. Kaplan, U.S.D.J.
July 5, 2017

However, under Application Note 4 to U.S.S.G. §2E1.1, the Racketeering guideline, Pasley's 2007 drug possession conviction, which is undoubtedly part of the racketeering activity, continues to count as a prior sentence for CHC purposes. Application Note 4 states:

> "Certain conduct may be charged in the count of conviction as part of a 'pattern of racketeering activity" even though the defendant has previously been sentenced for that conduct. **Where such previously imposed sentence resulted from a conviction prior to the last overt act of the instant offense, treat as a prior sentence under §4A1.2(a)(1) and not as part of the instant offense.**"(emphasis added).

**See, PSR ¶ 104 footnote 1.**

The Sentencing Table establishes six categories of criminal history. While **U.S. v. Mishoe** describes it as *"keyed primarily to the number and length of a defendant's prior sentences"* **241 F.3d 214, 218 (2d Cir. 2001)**, Pasley, whose longest prior prison term was the eight months he served when his probation was revoked on October 5, 2009 and whose only other prison sentence was the 90 days' incarceration for the 2007 drug possession charge, lands in Category III. **Supra. ¶¶ 103 & 106**. That increased horizontal criminal history, based on his nine and ten year old convictions, adds eleven months to the lower end of his guidelines range, *which is equal to the length of his two prior NYS prison terms combined.* **Id.**

Those short prison stints arguably served their rehabilitative and/or deterrent purpose(s). The PSR documents Pasley's progress in the ensuing period when he made sincere and prolonged efforts to put drug dealing in his past - his 2008/09 enrollment in the ADC job training where he earned his GED; the 2009/10 cashier job at a the White Plains Hess station; when employed at a women's shelter as a program aid, 2010 -2011; when he relocated to Durham, North Carolina to start his life anew, 2011 – 2013; and when he worked for Art Guild Plaques & Trophies, 2013 - 2015.

Page 8
Letter to Hon. Lewis A. Kaplan, U.S.D.J.
July 5, 2017

Disregarding Pasley's 2007 drug possession conviction does not alone diminish the damage. The two CHC points assessed for the 2006 robbery conviction combined with the two point penalty for committing the instant offense while on probation constrains him to CHC III. **PSR at ¶¶ 103 & 106**. The Second Circuit has endorsed horizontal departures in cases where the guidelines criminal history category overstates the seriousness of a defendant's criminal history. **U.S. v. Mishoe, 241 F.3d at 219.** In evaluating the guidelines criminal history a district may consider factors like the amount of drugs in prior offenses, the role in prior offenses, sentences previously imposed, and the amount of time previously served *compared* to the sentencing range called for by the guidelines. **Id.**

On the first factor – age - Pasley was sixteen and seventeen years old when he was convicted of his prior offenses. His prior prison terms, eight months and ninety days, are dwarfed by the 108 months the guidelines recommend here. **Id. at 219.** But under the guidelines regime a horizontal departure under **Mishoe** is limited to no lower than CHC I, 87 – 108 months. **See**, **§ 4A1.3(b)(2))(A); see also, §4A1.3, comment.(n.3)**(prohibition *"due to the fact that the lower limit of the guidelines range for Criminal History Category I is set for a first offender with the lowest risk of recidivism"*). However, considering that the guidelines *"are now advisory"* this policy limitation is no longer binding on this Court should it disagree with it when considering fashioning a variance for Pasley. **Kimbrough v. U.S., 552 U.S. 85, 101** ("… the Guidelines 'are now advisory' and that, as a general matter, 'courts may vary [the Guidelines ranges] based solely on policy considerations, including disagreements with the Guidelines.').

When the Court examines Pasley's criminal history and his personal biography an increase from eight months jail to nine years imprisonment for conduct which involves the same

activity is, without a doubt, the definition of a draconian sentence. Furthermore, when the Court considers that the guidelines mandate computing criminal convictions of when he was sixteen and seventeen years old, that his 2007 drug conviction that is part of the instant offense must also be counted toward CHC under the Racketeering guidelines, and his efforts to move away from drug dealing, these factors support our request for a variance.

**Point No. 2**
**In Fixing a Variance for Pasley We Ask the Court to Adopt a Crack/Powder Ratio of 1:1.**

There is no dispute that "[c]rack and powder cocaine are two forms of the same drug." **Kimbrough v. U.S., 552 U.S. 85, 94 (2007)**.  Neither can it be credibly maintained that the disparate treatment of crack cocaine in the United States Sentencing Guidelines is scientifically sound. **Id. at 109**. *"The crack cocaine Guidelines ... do not exemplify the Commission's exercise of its characteristic institutional role."* **Id.** As the Court noted, *"... [i]n formulating Guidelines ranges for crack cocaine offenses ... the Commission did not take account of 'empirical data and national experience'..."*, but rather *" ... looked to the mandatory minimum sentences set in the 1986 Act."* **Id.** Indeed, the Commission itself has reported that the crack/powder disparity produces disproportionately harsh sanctions. **Id**. It is thus a legitimate exercise of a district court's discretion to conclude that the crack/powder disparity yields a sentence "greater than necessary" to achieve § 3553(a)'s purposes.

While a welcome correction to racial disparity in federal sentencing, Congress's reduction of the *crack/powder ratio* from 100:1 to 18:1 by the *Fair Sentencing Act* of 2010 is

still *unfair* as applied to Pasley.[2]  Pasley's conduct in this run-of-the-mill crack conspiracy cannot be described as more egregious than many other of his fifty-seven codefendants such as to warrant a nine years' prison sentence.  **Kimbrough at 106** (recognizing the district courts' responsibility to set penalties and permitting judges who disagree with the Guidelines for policy concerns to depart from the statutory ratio <u>even in a mine-run case.</u>)(underline added).  See also **Spears v. United States, 555 U.S. 261, 265–66 (2009)** ("we now clarify that district courts are entitled to reject and vary categorically from the crack-cocaine Guidelines based on a policy disagreement with those Guidelines.").

While the FSA reduced the disparate treatment between the two forms of the same substance from 100:1 to 18:1, it failed to state a rationale for this long overdue change.  See **U.S. v. Fisher, 635 F.3d 336 (7th Cir. 2011)** *rev'd on other grounds sub nom*. **Dorsey v. United States, 565 U.S. 1057 (2011)** ("Debate surrounding the crack cocaine sentencing scheme and the infamous "100:1 ratio" has been raging for years, and there is strong rhetoric to be found on either side. The FSA is compromise legislation and must be viewed as such.")  Neither the Congressional record nor the Sentencing Commission's Amendment 770, which implements the

---

[2] **See, United States Sentencing Commission, Report to Congress: Impact of the Fair Sentencing Act of 2010, pp. 15 – 16,** (*'Beginning just prior to the FSA and accelerating after it, there has been a steep reduction in the number of crack cocaine offenders sentenced in the federal system... Notwithstanding the large change in the number of offenders sentenced ... the <u>demographic characteristics of crack cocaine offenders sentenced after the FSA are substantially the same as the demographic characteristics of those sentenced before the FSA</u>..."* In fiscal year 2014, 83.4% of crack offenders were black. The Commission also found that *"... [a]lthough they are responsible for a somewhat larger quantity of drugs, crack cocaine offenders sentenced after the FSA <u>are not, on average, more serious as measured by drug quantity.</u>"*)(underline added).

Page 11
Letter to Hon. Lewis A. Kaplan, U.S.D.J.
July 5, 2017

FSA revision, provides an explanation for why an 18:1 ratio is more just than the Sentencing Commission's original 1995 proposal of lowering the crack/powder cocaine ratio to 1:1. Notwithstanding the 18:1 ratio, district courts throughout the nation continue to treat both kinds of cocaine on a 1:1 basis. **United States v. Williams-Bey, (2d Cir. May 23, 2017)--- Fed.Appx. ----2017 WL 2260956** (noting, where the parties' plea agreement actually anticipated that action, that the district court had expressly granted the variance urged by defendant, substitution of a 1:1 crack-to-powder cocaine ratio for the Guidelines 18:1 ratio and that); **United States v. Morris, 775 F.3d 882, 887 (7th Cir. 2015)** (concluding, where he had maintained that the guidelines' 18:1 disparity was the result of political compromise rather than for any reason founded in medical, chemical, physiological, or other scientific or social science evidence, that a defendant's argument for application of a 1:1 crack-to-powder cocaine ratio is not an argument that is so weak as to not merit discussion); **United States v. Freeman, 843 F.3d 315, 318 (7th Cir. 2015)** (recognizing that a number of courts have determined that the 18:1 ratio is unreasonable); **United States v. Dixon, 576 Fed.Appx. 219 (4th Circ. 2014)** (district court did not abuse its discretion in granting a variance for a 1:1 ratio of powder to crack cocaine).

Our requested 41 months variance is crafted by adopting a 1:1 ratio and applying it, first, to the Drug Quantity Table under §2D1.1 and then to the Sentencing Table. In Pasley's case, 196 grams of cocaine base is comparable to level 18 for roughly the same amount of powder. Accepting the other guidelines calculations in the PSR namely, +2 for firearms possession, +2 for role and CHC III, Pasley's Adjusted Offense level would be level 19 which computes to 37 – 46 months. We recommend for a variance the middle of this range, 41 months. As **Kimbrough** states " …. *it would not be an abuse of discretion for a district court to conclude when sentencing a particular defendant that the crack/powder disparity yields a sentence 'greater than*

*necessary' to achieve §3553(a)'s purposes, even in a mine-run case"*. **id. at 109.** There is nothing in the facts as reported in the PSR which support that Pasley's drug dealing is anything more than a "mine-run case". We respectfully ask that the Court make this finding and sentence him as requested.

## Family Letters

Attached are six letters from Pasley's paternal grandmother, mother of one of his children, and close friends and neighbors. These letters confirm Pasley's personal history as recounted in the PSR and this memorandum. In addition, attached are two BOP certificates of completion, one in particular is the Non-Residential Drug Abuse Program.

## Conclusion

Considering both Preston Pasley's personal history and characteristics, and the unduly harsh sentence he would receive if the Court were to follow the guidelines, we respectfully ask for

Page 13
Letter to Hon. Lewis A. Kaplan, U.S.D.J.
July 5, 2017

a variance of *41 months imprisonment and Supervised Release* in accordance with U.S.S.G.  18 USC §§ 3553(a).  We respectfully reserve the right to raise additional issues, if necessary, at the time of sentencing.

    Thank you.

                                      Respectfully submitted,

                                      s/ Richard Palma

                                      Richard Palma (Bar No. RP 4441)

copies:	A.U.S.A. Rachel Maimen (e-mail)
	U.S.P.O. Nichole Brown-Morin (e-mail)
Attachments:   Family letters & BOP Certificate (Exhibits A -  F )


    Thank you.

                                      Respectfully submitted,

                                      s/ Richard Palma

                                      Richard Palma (Bar No. RP 4441)

Copy: ECF filed.