UNITED STATES DISTRICT COURT
SOUTHERN DISRICT OF NEW YORK
--------------------------------------------------------------------X

UNITED STATES OF AMERICA

                                                    16 Cr 212 (LAK)


                    - V-

JAQUAN MCINTOSH
                        DEFENDANT.
--------------------------------------------------------------------X




**SENTENCING MEMORANDUM ON BEHALF OF
DEFENDANT JAQUAN MCINTOSH**




                    A. James Bell, Esq.
                    LAW OFFICE OF A. JAMES BELL
                    26 Court Street, Suite 1406
                    Brooklyn, New York  11201
                    T: (718) 578-4983
                    F: (718) 643-0025

                    *Attorney for Defendant*
                    *Jaquan McIntosh*



1

UNITED STATES DISTRICT COURT
SOUTHERN DISRICT OF NEW YORK
--------------------------------------------------------------------X

UNITED STATES OF AMERICA

                                                      16 Cr 212 (LAK)

              - V-

JAQUAN MCINTOSH
                    DEFENDANT.
--------------------------------------------------------------------X

## SENTENCING MEMORANDUM ON BEHALF
## OF DEFENDANT JAQUAN MCINTOSH

This sentencing memorandum is respectfully submitted on behalf of my client,

Jaquan McIntosh pursuant to Rule 32(f) of the Federal Rules of Criminal Procedure.

The sentencing hearing for Mr. McIntosh is scheduled for July 19, 2017. The

objective of this memorandum is to provide background information about him to assist

the Court in formulating a sentence that is sufficient, but not greater than necessary, to

comply with the purposes of sentencing set forth in 18 U.S.C. § 3553(a). In light of the

information articulated in the Presentence Report ("PSR"), the information contained

herein, and the Government's anticipated response, the defense recommends that the

Court impose a sentence at variance with the Sentencing Guidelines pursuant to the

Court's authority under United States v. Booker, 534 U.S. 220 (2005) and 18 U.S.C. §

3553. Specifically, the defense recommends a non-guideline sentence no greater than

180 months incarceration with three years of supervised release.

In this case, we submit that such a sentence is a reasonable sentence which takes

into account the following uncontroverted facts: (1) Donville Simpson and other Big

Money Bosses ("BMB") members traveled to Eastchester Gardens on October 5, 2013

armed with guns and other weapons with intent to retaliate and shot co-defendant Kraig Lewis; (2) Donville Simpson possessed a gun and shot at 2Fly members including Mr. McIntosh; (3) Mr. McIntosh retrieved a gun, returned fire at Mr. Simpson and the other BMB members, resulting in the tragic and unfortunate death of Mr. Simpson; (4) On August 7, 2012, Mr. McIntosh was not armed with a weapon nor did he shoot at BMB members.

We further submit that the recommended sentence fully satisfies the articulated factors of sentencing in 18 U.S.C § 3553 and we argue that a sentence at variance finds support and is premised upon four primary grounds: (1) a sentence under the guidelines fails to account for the dysfunctional background and extraordinary lack of guidance Mr. McIntosh endured during his youth; (2) Mr. McIntosh's exceptional post-arrest and overall institutional rehabilitation, along with the imposition of a substantial but non-guideline sentence, reflects a diminished likelihood of recidivism in this case; (3) the mitigation circumstances present in the commission of the offense; and (4) Mr. McIntosh already served approximately 19 months in New York State prison for the same conduct before this Court.

When Mr. McIntosh eventually reaches the supervised release portion of his sentence, we request that the following special conditions be mandated by the Court: 1) participation in an intensive substance abuse counseling and treatment, mental health treatment, family counseling and educational / vocational training.  We also seek the Court's recommendation that his sentence be served in the Otisville Federal Correctional Institution or, in the alternative, a correctional facility in close proximity to New York City and/or within the Northeast region to facilitate family visits.

I.      **INTRODUCTION**

Mr. McIntosh is charged in count one of the indictment that he and others participated in a racketeering conspiracy, in violation of Title 18, U.S.C. § 1962(d), from at least in or about 2007, up to and including in or about 2016, and carries a maximum term of life imprisonment.  Although the PSR provides a great deal of information about Mr. McIntosh's personal history and information relevant to the instant offense, at the time of his arrest Mr. McIntosh had minimal contact with the criminal justice system, and thus, how he came to be involved in this offense warrants explanation.

II.     **THE PLEA AGREEMENT AND PRE-SENTENCE REPORT**

1.      **Relevant Case History / Guilty Plea**

On April 28, 2016, Mr. McIntosh was arrested following an investigation conducted by the New York City Police Department ("NYPD"); Drug Enforcement Administration ("DEA"); and Bureau of Alcohol, Tobacco and Firearms and Explosives ("ATF").  Since the date of his arrest and presentment hearing, the defendant remains in custody pending prosecution.

On November 7, 2016, Mr. McIntosh appeared with the government before the Honorable Judge Sarah Netburn, pursuant to a plea agreement dated October 28, 2016. He plead guilty to Count One of the Indictment and admitted to participating in a conspiracy to engage in a pattern of racketeering activity as a member of a street gang called 2Fly, in violation of Title 18, U.S.C. § 1962(d).  Mr. McIntosh also accepted responsibility for his conduct that lead to the death of Donville Simpson on October 5, 2013 and his involvement in the August 7, 2012 shooting of two rival gang members. These two acts served as the underlying racketeering offenses contemplated under Title

18, U.S.C. § 1962(d).

## 2.    Federal Sentencing Guidelines Calculations

Although the USSG are advisory, the Court is required to independently calculate the advisory sentencing range.  Pursuant to Rule 32 of the Federal Rules of Criminal Procedure, Probation Officer Nicole Brown-Morin conducted an interview of Mr. McIntosh and prepared a PSR, which included a calculation of the applicable advisory Sentencing Guidelines for this case.   See, PSR, ¶ 149, page 31.

**Offense Level**

The November 1, 2016 edition of the Sentencing Guidelines Manual was used to determine Mr. McIntosh's offense level.  Pursuant to USSG § 2E1.1, each underlying racketeering offense is treated as if it was contained in a separate count of the conviction and was not grouped together.  As a result, a separate guideline analysis was required for each separate group of offenses.  See, PSR ¶ 8(c), page 7.

Group 1: Second Degree Murder

The PSR's calculation set the base offense level at 38, as directed by Guideline § 2A1.2(a) because the offense resulted in second-degree murder in violation of 18 U.S.C. § 1111.  See, PSR ¶ 8(f), page 7.

Group 2: Attempt to Commit Murder

The guideline calculation for a violation of 18 U.S.C. §1113 is found in Guideline § 2A2.1.  The base level set for this offense is 33.  See, PSR ¶ 8(h), page 7.

The PSR applied the base level of 38, since it is the higher of the two Group levels.  See, PSR, ¶ 8(k), page 8.  Mr. McIntosh clearly demonstrated his acceptance of responsibility for the offense and gave timely notice of his intention to plead guilty.  As

such, a full three level reduction is included for acceptance of responsibility pursuant to U.S.S.G. § 3E1.1(a) and (b).  See, PSR, ¶ 8(l), page 8.

**Criminal History Category**

The PSR determined that Criminal History Category II is applicable based upon the 2010 Youthful Offender adjudication for Grand Larceny in the 4th Degree in Bronx County Family Court.  The PSR assessed one point for the adjudication and two points for their determination that the commission of the instant offense occurred while under probation supervision.  See, PSR, ¶ 110-113, page 26.  The PSR concluded that with an applicable total offense level of 37, combined with a Criminal History Category of II, the advisory Guideline sentencing range applicable to this case is 235 – 293 months.  See, PSR, ¶ 149, page 31.

Counsel filed timely written objections on behalf of Mr. McIntosh to portions of the PSR on January 17, 2017.  Specifically, paragraphs 110 and 113 reference the addition of 3 points to the defendant's criminal history that was not contemplated by the Government or Counsel in our plea agreement.  These additional points result in an increased Criminal History Category of II (instead of I), and which ultimately increased the defendant's Guideline range to 235 - 293 months' of imprisonment (instead of 210 - 262), based on the following:

1.     On October 5, 2010, then 15-year-old Jaquan McIntosh was adjudicated a Youthful Offender for Grand Larceny 4th Degree for allegedly stealing a bicycle, and sentenced to 12 months' probation on November 3, 2010.  For this juvenile adjudication, 1 point was added pursuant to USSG § 4A1.1(c) and § 4A1.2(d)(2)(B). See, PSR, ¶ 110, page 26.

2.      Because Mr. McIntosh committed the instant offence while allegedly under probation supervision for the juvenile adjudication, an additional 2 points were added pursuant to U.S.S.G. § 4A1.1(d). See, PSR, ¶ 113, page 26.

In regard to PSR at ¶ 113, page 26 within our objection letter, Counsel advised Probation Officer Brown-Morin of our contention that Mr. McIntosh did not commit the instant offense while under probation supervision and further that we presented evidence to the Government in support of this position.  The discovery in this matter, as well as conversations with the Government, led us to initially believe that a Bronx County drug arrest on November 20, 2010 was evidence of his agreement to participate in the underlying racketeering conspiracy in this case.

Upon further conversations with Mr. McIntosh and review of the official records of the Bronx County Clerks Office, we learned that no criminal charges were ever filed by the local prosecutors.  As proof of this fact, we requested and received an official Certificate of Disposition that clearly indicates that the referenced matter was "Non-Processed and No Criminal charges were filed with this arrest."[1]  We provided this document to the Government for their review and now believe there is no evidence to support the position that Mr. McIntosh agreed to participate in the underlying racketeering conspiracy while under probation supervision.  Therefore, we submit that the additional 2 points pursuant to U.S.S.G. § 4A1.1(d) is not warranted.

---

[1]See, Exhibit A: Certificate of Disposition – City of New York, Bronx County

III.     **SENTENCING RECOMMENDATION**

In the wake of <u>United States v. Booker</u>, 543 U.S. 220 (2005), the Second Circuit in <u>United States v. Crosby</u>, 397 F.3d 103 (2d Cir. 2005), set forth guidance for the imposition of a sentence against a criminal defendant.  Honorable Judge Newman explained that although the Guidelines are no longer mandatory, sentencing judges must still "consider" the guidelines along with the factors listed in 18 U.S.C. §3553(a).  See, <u>Booker</u>, at 245-246.  The conclusion reached by the PSR, however, is based upon a mechanical application of the now advisory sentencing guidelines, which fails to account for or even recognize the hardship faced by a young boy growing up in an environment he neither created nor selected as his residence.

18 U.S.C. §3553(a)(1) compels the broader consideration of the history and characteristics of the defendant.   In addition, 18 U.S.C. §3661 provides that "no limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court may receive and consider for the purpose of imposing an appropriate sentence."  The sentencing analysis pursuant to 18 U.S.C §3553(a) employs broader concepts than the advisory guidelines by considering the interplay between the background and experiences of the individual offender.  The statute, while broad in concept, places an emphasis on the individualized circumstances relevant to the sentencing of an offender and, therefore, is more appropriate for the issues present in this case.

Once the applicable guideline range has been determined, the sentencing court should consider the guideline along with all the factors listed in § 3553(a).  However, no Circuit Court has given specific guidance as to what weight should be given to the

advisory guideline range or the factors enumerated under §3553(a).  It has been left to the Court's discretion to determine what is reasonable under the circumstances of each case. More simply put, the sentencing judge is entitled to find all the facts appropriate for determining either a guideline sentence or a non-guideline sentence.

Ultimately, 18 U.S.C. §3553(a) instructs the sentencing court to impose a sentence that is sufficient, but not greater than necessary to meet the sentencing objectives of Congress.  In the instant case, the congressional objectives of punishment for the offense, deterrence, promoting respect for the law and protecting the public from future crimes of the offender are satisfied by a sentence no greater than a 180-month incarceration for Mr. McIntosh.  Therefore, based upon the combination of issues raised herein, the careful balancing of the sentencing objectives set forth in all the factors of 18 U.S.C §3553, along with the facts particular to this case, mitigate in favor of imposing a sentence outside and below the advisory guidelines range.

      1.      **The Nature and Circumstances of the Offense**

Count one of the indictment charges Mr. McIntosh and other members of the 2Fly street gang with conspiring and participating in a racketeering conspiracy in the neighborhoods of the Bronx from approximately 2006 to 2017.  2Fly principally operated within and around Eastchester Gardens, a public housing development located in the Northern Bronx.  Eastchester Gardens is a rectangular complex of residential buildings boarded by Burke, Adee, Yates and Bouck Avenues, in the middle of which sists a playground.  PSR at ¶ 13, page 15.

The acts of violence cited in this indictment related principally to the longstanding rivalry between 2Fly and BMB, another gang that operated in the North Bronx.  See, PSR

at ¶ 23, page 16.  Among other acts, these gangs developed a practice of "mobbing" where members of a gang assembled in large groups and traveled to the base of operations of a rival gang to engage in acts of violence there.  See, PSR at ¶ 23, page 16. The evidence in this case indicates that the two underlying racketeering offenses, the attempted murder on August 7, 2012 and the October 5, 2013 murder of Donville Simpson, were the result of these two rival gangs "mobbing".

On August 7, 2012, evidence shows that 2Fly members, including co-defendants David Mattison, Laquan Parrish, Jaquan McIntosh, Sean McIntosh and others traveled to a park where BMB members were known to spend time.  They all traveled there together with intention of retaliating for a past confrontation between the groups.  Counsel believes it is important to highlight that Mr. McIntosh was not armed with a gun.  His finger was not on the trigger of any gun that afternoon and Mr. McIntosh did not fire the shots that struck BMB members Michelle Jemison and James Pilgrim.

The Government's own evidence supports this position and indicates that co-defendants David Mattison and Laquan Parrish were the actual shooters on August 7, 2012.  Counsel relies upon information gathered during our investigation, conversations with state appointed counsel and various documents in the Government's discovery. Particularly informative is the sworn affidavits of DEA SA Moises Walters, who affirms that during his investigation, a witness indentified David Mattison and Laquan Parrish as perpetrators of the shooting and identified the pair from photo arrays and specifically identified both men as the shooters.  The same witness also identified Mr. McIntosh and Sean McIntosh from photo arrays and informed Agent Walters that Mr. McIntosh and his brother Sean were two of the individuals seen with Mattison and Parrish.  See,

Application for Warrant and Order for Cell Phone Location and Pen Register Information, Case No. 16Mag2351; See also, Application for A Search Warrant, Case No. 16Mag2353.

The October 5, 2013 murder of Donville Simpson also occurred during and as a result of members of BMB traveling to the Eastchester Gardens complex to confront 2Fly members who they believed were involved in a recent fight where a BMB member was injured.  Based on the information available to me, including Government documents, conversations with my client and other witnesses, on the afternoon of October 5, 2013, BMB members, including Donville Simpson, were armed with various weapons including guns.  Again, the sworn affidavit of SA Moises Walters informs us that a witness interviewed in SA Moises' investigation advised that BMB members, including Donville Simpson shot at 2Fly members and Mr. McIntosh shot back killing Mr. Simpson.  See again, Application for a Search Warrant, Case No. 2353.

This information is brought to the Court's attention not to excuse Mr. McIntosh for his conduct, for he fully accepts responsibility and is remorseful for his actions, but rather to place into context how and why he came to participate in these charged crimes. The facts and circumstances that surround these offenses we submit, will assist the Court in arriving at a sentence that is sufficient but not greater than necessary to reach the sentencing goals of Congress to punish Mr. McIntosh for his role and participation in these offenses.  The facts and circumstances of these offenses are significant factors that we argue, mitigate in favor of a sentence no greater than 180 months incarceration at variance with the advisory sentencing guideline recommendation.

2.    **History and Characteristics of Jaquan McIntosh[2]**

Mr. McIntosh was born into a set of risk factors and unfortunate circumstances, practically from birth, that framed the trajectory of his life that followed.  Birth records show he was born, Jaquon Herman McIntosh[3] on November 12, 1994 to his mother, Angela McIntosh.  No father is listed on his birth certificate and no man since has stepped forward, biological or otherwise, to fill that role in this life.  His home life was chaotic, often moving from one homeless shelter to another with his mother and siblings. He endured years of watching his mother suffer both physical and emotional domestic violence from the various men in her life.  Most notably, he reports that some of his earliest memories growing up are of the gunshots that frequently rang out in his neighborhood and witnessing the violence that besieged Northern Bronx where he grew up.

Of course counsel does not suggest that any set of circumstances or even the most severe risk factors are justifications for murder.  Nor does counsel seek to excuse this criminal behavior.  Mr. McIntosh continues and has always expressed to me a genuine, heartfelt sense of regret and remorse for his conduct that caused the death of Donville Simpson.  He accepts that a long period of incarceration will ensue and the toll it will inevitably take on him and his family.  Counsel seeks only to present Mr. McIntosh's history in a manner that attempts to explain how a young man who by all accounts is

[2] Portions of this section is taken from the Psychosocial Assessment Report drafted by Nancy M. Tricamo, LCSW dated May 7, 2017 and filed in supplement to the sentencing submission by Thomas F. Dunn, Esq. on behalf by Sean McIntosh, the brother and co-defendant of my client herein, Jaquan McIntosh.
[3] The official certificate of birth misspells Mr. McIntosh's name.

incredibly intelligent, articulate and fully self aware, found himself involved in these crimes.

His mother, born in Jamaica, West Indies, came to the United States at the age of twenty-one.  Angela McIntosh is the mother of eight children with six different fathers. She has never worked since living in the U.S. and has always supported her children and eventually two grandchildren, through public assistance.  Mr. McIntosh's siblings are Kevion McIntosh, age thirty-three and living in Jamaica, Teneisha McIntosh, thirty-one, Derrick and Errick McIntosh, twenty-nine year old twins, Tiffany McIntosh, age twenty-eight, Hermesia Bennett, age twenty-four, Sean McIntosh twenty-five (also imprisoned at the MDC) and Shalome McIntosh, age seventeen.  Hermesia and Shalome are living in a shelter with their mother and the rest of Mr. McIntosh's siblings.  Tiffany is living independently and is working full-time and attending college to become a nurse.

Mr. McIntosh describes his childhood growing up as difficult.  As expected, the nominal public assistance his mother received was never enough to support their large and ever growing family.  The family struggled financially and his mother was unable to provide sufficient food, clothing or electricity, which inevitably forced them to move to and from various homeless shelters throughout New York City.  As a result, Mr. McIntosh attended at least six different schools before attending high school.

The need to relocate often never allowed young Mr. McIntosh to achieve a rhythm or stability in any one school.  He found himself struggling to comprehend what he was learning and recalls the difficulties of staying focused while in school. Ultimately, he was referred for an evaluation for Attention Deficit Hyperactivity Disorder (ADHD).  His mother remembers taking him and his brother Sean to Jacobi Hospital for

the evaluation through the referral from the school.  Ms. McIntosh remembers both boys were diagnosed with ADHD, and the facility recommending medication and mental health counseling.  Counsel suspects that the school district developed an IEP (Individualized Educational Plan) because Mr. McIntosh recalls thereafter receiving special education services because of his ADHD.  Unfortunately, Ms. McIntosh did not follow up with the recommendation for medication and mental health counseling, and Mr. McIntosh believes he never realized his full potential.

Mr. McIntosh reports that growing up, his mother did the best she could to protect and provide for the family.  Unfortunately, she also endured years of domestic violence in her relationships during young Jaquan's childhood.  He vividly recalls the many occasions where his mother and her current boyfriend argued and physically fought.  He related that at times he felt the need to intervene, but as a small boy he was too afraid to do so.  The level and persistence of the domestic violence impacted him deeply.  The physical and emotional abuse she suffered only served to further illuminate the fact that there were no positive role models in his life.

In light of this history, it is simple to see the risk factors and situations present in his life impacted his history, profoundly and predictably.  Poverty, enduring domestic violence, parental abandonment and living in a drug infested and violent community are substantial risk factors that inevitably work to derail even the most grounded among us.  Missing protective factors such as positive role models, individual skills and opportunities presented in life inevitably assist to balance the risks we all face.  Mr. McIntosh had very few of these protective factors working in his favor.

The culmination of these risk factors and the resulting damage to the emotional spirit of this young man, eventually distorted his view of life and those "common" values kept by those of us un-besieged by these fateful circumstances.  By his early teenage years, young Jaquan began seeking love and self value in the streets, a dangerous endeavor that all too often leads to unfortunate contacts with the criminal justice system.  By his late teens, he became a member of the 2Fly gang.  He recounts that his new family watched out for him, protected him and in many ways, was much less dysfunctional than his own biological family.

An influential study by 39 experts on child psychopathology convened by the Department of Justice, Office of Juvenile Justice and Delinquency Prevention (OJJDP), identified particular risk and protective factors that are crucial to developing effective early intervention and protection programs for very young offenders.[4]

Professionals have learned a great deal about which risk factors are relevant for predicting criminality in teens and young adults.  For instance, most professionals agree that early on in a child's life, the most important risks stem from individual factors and family factors (i.e., parental antisocial or criminal behavior, substance abuse, domestic violence, poor child-rearing practices).  As the child grows older and becomes integrated into society, new risk factors related to peer influences, the school, and the community begin to play a larger role.  A combination of negative risk factors was present and served to derail Mr. McIntosh's life.  As set forth above and the PSR, Mr. McIntosh was deeply impacted by the lack of options due to his family's constant financial struggles, the

---

[4] See, Bulletin Series, *Risk and Protective Factors of Child Delinquency*, US Dept. of Justice, Officer of Programs, Office of Juvenile Justice and Delinquency Prevention 2003 (edited by Wasserman, Keenan, Trembly, Cote, Herrenkohl, and Petechuk).

enduring domestic violence, parental abandonment, living in a drug infested environment and violence that permeated his neighborhood.

Mr. McIntosh's arrest and lengthy incarceration in the instant matter has served as a wake up call and a step forward toward lasting rehabilitation.  More importantly, he fully accepts responsibility and articulates remorse for his own conduct.  He sadly acknowledges the impact of his conduct and his punishment on the lives of his family, and most significantly, on his mother.  Despite the realization that he faces lengthy incarcerated as a result of these charges, Mr. McIntosh expresses neither resentment nor anger regarding his circumstances.  He remains hopeful for a future with meaningful employment so he can financially support himself in order to have a successful and productive life.

3.     **Post Arrest Rehabilitation**

State authorities initially arrested Mr. McIntosh on or about September 20, 2014 and the Bronx County District Attorneys Office were proceeding with the prosecution of these charges underlying the racketeering conspiracy in this matter.  As such, he was then incarcerated at Rikers Island prior to being brought to this District by way of writ.

As a result of this arrest, he was forced to leave school during the 12th grade in 2014.  While incarcerated at Rikers Island, he continued his education with daily tutoring sessions to obtain his General Equivalence Degree (GED).  Unfortunately, he did not have an opportunity to take the exam due to the timing of the writ.  However, he did participate and successfully complete a 10-week Moral Recognition Therapy program, which sought to reduce recidivism among juvenile offenders by increasing moral reasoning.  The program is systematic and implements a cognitive-behavioral approach,

which positively addresses an adolescent's ego, social, moral and positive behavioral growth.  He also reported that while at Rikers Island, he sought out and was granted therapeutic services twice a week between September 2014 and April 2016 because he realized he was having difficulty adjusting to being incarcerated.

Since his admission to the BOP at the Metropolitan Detention Center, Mr. McIntosh used his time productively seeking rehabilitation and making strides toward possible redemption.  He regularly participates in the Inner Circle group, which assists inmates in forming the skills necessary to make better decisions.  He is also a regularly fixture in the yoga classes, as well as chess and the basketball programs, which he reports is instrumental in reducing the inherent mental and emotional stress of incarceration.

The level of maturity attained in the past 14 months in custody at MDC was not without missteps.  Within months of his detention, he incurred serious infractions of BOP rules and received a severe punishment. See, PSR ¶ 10, page 8.  Since that infraction, his conduct has improved dramatically.  His attitude and willingness to abide by societal rules has substantially evolved—a clear indication of his ability to succeed once he is released.

On a personal note, counsel has also noticed that Mr. McIntosh is presently a much more thoughtful and mature young man than the person I met at his presentment. He has utilized his time in detention for genuine self-reflection.  He has taken stock in himself and has spent time considering his future.  As discussed above, the skills and training he received in the Moral Recognition Therapy program will be invaluable in becoming a productive member of society upon his release from prison.

    4.    **<u>Consideration for Time Served</u>**

We further ask the Court to take into consideration the 19 months Mr. McIntosh spent in custody while detained at Rikers Island pending trial in the Bronx for the death of Donville Simpson pursuant to § 3553(a), when fashioning a sentence that is sufficient but not greater than necessary.  It is appropriate to take this period of time into account because (a) it represents time in custody for the same offense conduct currently before this Court and (b) the time will not be otherwise counted by the BOP, nor is it an "undischarged term of imprisonment" considered under U.S.S.G. § 5G1.3.  Additionally, the conditions under which Mr. McIntosh was detained at Rikers Island are also similar to those he would be subject to by the BOP under a federal sentence, if not substantially worse.  Therefore, in fashioning a sentence which is sufficient, but not greater than necessary, and when considering all relevant factors, we respectfully ask that Mr. McIntosh's uncounted time in state custody be considered in the Court's § 3553(a) analysis.

    5.    **<u>The Other § 3553(a) Factors</u>**

        **i.**    Individual Deterrence

Mr. McIntosh's person history since the age of 15 suggests he would not be a recidivist.  Although he has pled guilty to very serious crimes in this matter, his criminal record reveals a juvenile adjudication for stealing a bicycle when he was just 15 years of age.  In addition, since his incarceration in September 2014, Mr. McIntosh has also participated in a long list of programs at Rikers Island as well as at the MDC. He continues to express genuine, heartfelt sense of regret and remorse for his conduct that caused the death of Donville Simpson.  In addition, Mr. McIntosh has given

considerable thought into the development of his long-term career goals that are well within his capabilities and has already embarked on his plan to achieve these goals, starting with obtaining his GED.

      **ii.**      General Deterrence

In this case, Congress has sent a message of general deterrence by setting the possibility of State sanctioned death for the crime for which Mr. McIntosh was indicted.  Although Mr. McIntosh was permitted to plead guilty to a lesser-included offense with no mandatory minimum sentence, Congress' general deterrence provision is more than sufficient to meet this goal of sentencing.

      **iii.**      Need for Educational or Vocational Training and Medical or Substance Abuse Treatment

Mr. McIntosh faces a guideline sentencing range of 235-293 months and even a term of 180 months will be more than adequate to provide him with an opportunity to complete his GED (if not completed before he is designated) and pursue other educational and vocational training.  Mr. McIntosh could also benefit from participating in a substance abuse program.

**IV.**      <u>A Reasonable Sentence</u>

Mr. McIntosh's personal history, when viewed in light of the Supreme Court's recent decisions in <u>United States v. Kimbrough,</u> 552 S. Ct. 558 (2007) and <u>United States v. Gall</u>, 552 S. Ct. 586 (2007), supports a sentence no greater than 180 months incarceration.

Although <u>Kimbrough</u> does not eliminate reliance on the guideline calculations, it nevertheless highlights the Court's previous insistence in <u>United States v. Booker,</u> 543 U.S. (2005), that the guideline calculations are merely advisory and serve as only one of

several factors informing the decision whether a sentence is "not greater than necessary to accomplish the goals of sentencing."

Over the last 14 months, Mr. McIntosh has grown and matured immensely. Under 18 U.S.C. § 3553(a), the nature and circumstances of the offense in this matter, along with an individualized assessment of Mr. McIntosh's history and characteristics as detailed in the PSR and above, warrant a below guideline sentence. A sentence to a term of incarceration, no greater than 180 months, would still reflect the seriousness of the offense and evoke respect for the law.

Mr. McIntosh is an optimistic and hopeful young man, determined to become a productive citizen. He has never been crippled by hopelessness or self-pity. He wants very badly to succeed where so many others have failed. He has recognized that much of his criminal behavior was tied to his own poor decisions and is not burdened by anger or an unearned sense of entitlement. He is simply a young man who found himself in a tragic situation and was not mature or strong enough to overcome it. He now has both the strength and maturity to overcome any set of social conditions no matter how difficult.

Thus, given all the facts and circumstances of this case as detailed herein and in the PSR, namely

- his early and complete acceptance of responsibility;

- his genuine remorse for his actions;

- earnest attempts at rehabilitation including studying and taking the GED exam

- very young age

- lack of guidance from male family members in his formative years`

it is respectfully submitted that no more than a 180 month incarceratory sentence would constitute a reasonable sentence for Mr. McIntosh.

## **CONCLUSION**

For these reasons, it is respectfully requested that this Court impose a non-guideline sentence of not greater than 180 months.

Dated:  New York, New York
　　　　July 7, 2017

                              Respectfully submitted,

                                  */S/*
                              _____
                              A. James Bell, Esq.
                              LAW OFFICE OF A. JAMES BELL
                              26 Court Street, Suite 1406
                              Brooklyn, New York 11201
                              T: (718) 578-4983
                              F: (718) 228-7292

                              *Attorneys for Defendant*
                              *Jaquan McIntosh*