UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x

UNITED STATES OF AMERICA,

      -against-

                                        16 Cr. 212 (LAK)

ANDRE BENT,

              Defendant.

------------------------------------------------------------x

## PRE-SENTENCE MEMORANDUM ON BEHALF OF DEFENDANT ANDRE BENT

BENNETT M. EPSTEIN
Attorney for Defendant ANDRE BENT
100 Lafayette Street
New York, NY 10013
(212) 684-1230

LAW OFFICES
**BENNETT M. EPSTEIN**
**100 LAFAYETTE STREET**
**NEW YORK, NY 10013**

**(212) 684-1230**

September 5, 2017

Hon. Lewis A. Kaplan
United States District Judge
Southern District of New York
US Courthouse
500 Pearl Street
New York, NY 10007

                                               Re: United States v. Andre Bent
                                               16 Cr. 212 (LAK)

Dear Judge Kaplan:

       This letter is respectfully submitted as a Pre-sentence Memorandum on behalf of Andre Bent, who is scheduled to be sentenced on September 19, 2017. He comes to this Court for sentencing on his plea of guilty to Racketeering Conspiracy, after having been brought into Federal custody while serving a sentence in New York State custody over the past six years. The State charges were part of the instant conspiracy, as was a prior juvenile sentence for robbery imposed by the Family Court at age thirteen. All of the State charges, and the Federal charges comprising the instant case, arose between the years 2006, when he was thirteen, and 2011, when he began serving his State sentence, just after he turned eighteen.

       Now age twenty-four, Andre was brought to New York from Jamaica at the age of 5 and raised in the Bronx, fatherless, by his maternal grandmother and disabled mother in an area ruled by territorial youth gangs. He became associated with one of them, known here as "2Fly", at an early age (Pre-sentence Report, hereinafter "PSR", Paragraphs 78-79, 85). As an examination of his social and educational history reveals, this association was highly predictable.

       Andre's intellectual deficits, frustration and anger were noted quite early in his life. He was treated for depression as early as the fifth grade. His elementary school records noted that he had a learning disability, possibly dyslexia, as well as anger issues. He was assigned to special education early on because of his difficulty reading and writing. (Having represented him in this Court for over a year, we can attest that, despite what the PSR notes were his best efforts to improve himself in State Prison, his ability to read and write remains limited at best) (PSR, Paragraphs 107, 117-118).

1

At the age of 13, Andre was placed in a juvenile facility after being charged with a robbery that was part of the instant racketeering conspiracy (PSR, Paragraphs 70, 101). At the facility, he continued to be treated for depression (PSR, Paragraph 104). At the age of 15, he was sent to another facility, Lincoln Hall, where it was noted that during his brief time in a community school he was suspended for truancy. His "gang affiliation and association with negative peers" was listed as his "greatest problem in school" (PSR, Paragraph 114). At Lincoln Hall, it was recommended that he engage in a structured behavior modification program and substance abuse treatment because he was impulsive and had difficulty obeying rules. He was diagnosed with "Conduct Disorder" and cannabis abuse, with "Borderline Intellectual Functioning" (PSR, Para. 102).

He was apparently released from Lincoln Hall at the age of 16, to an out-patient drug program, which he did not complete. But he did complete a 45-day inpatient program thereafter (PSR, Paragraphe 110-111). His City high school records from the Committee on Special Education describe him as exhibiting "immature behavior", poor social skills that were not always age appropriate, and being "overwhelmed by the school experience" (PSR, Paragraph 102).

Andre reportedly drank to the point of intoxication regularly from the age of 15. He also smoked marijuana from age 11 and daily from the time he was 14 or 15 until his arrest on the State charges in 2011. He also used Ecstasy regularly from age 17 until his arrest on the State charges (PSR, Paragraphs 106-108).

All told, his is a frightening childhood history, with poverty and serious intellectual deficits feeding drug abuse and leading to the anti-social behavior that brings him here. As the Probation Department aptly puts it, "It is understandable given the defendant's background, why gang membership may have been attractive to him". " [He] suffered from depression and anger issues during his childhood and attributed this to the family's financial struggles. He reported an early history of substance abuse and may have been self-medicating his mental health issues with drugs and alcohol. Bent likely saw membership in a the gang as a means to support his drug/alcohol addiction and financially provide for himself and later, provide for his two children" (PSR, page 37).

In January, 2011, a month after his 18th birthday, and then again a month later, he was arrested by the NYPD and incarcerated shortly after the latter date on State charges of robbery and assault of a rival gang member, and sentenced to a six year definite sentence. This conduct was, as previously stated, both under the plea agreement and according to the Pre-sentence Report, a part of the instant racketeering conspiracy. (The Presentence report, Paragraph 72, correctly refers to the February 2011 robbery as taking place inside a "commercial establishment", but the victims were rival gang members who were inside a chicken place in the other gang's territory It was not the establishment that was robbed).

Although clearly "relevant conduct", these offenses and the juvenile offense are nevertheless counted in the Criminal History pursuant to USSG 2E1.1, Application Note 4 (PSR, Paragraphs 40, 41, 71,72), a quirk in the Guidelines for Racketeering that persists although, in point of fact, this defendant was immediately imprisoned in February, 2011and did not

2

participate in any other overt acts of the conspiracy going forward. The additional conspiratorial conduct referred to in the plea agreement, i.e. that which was not part of the State charges, actually preceded the State charges in point of time, and consists of his participation from ages 13 to18 in the gang's narcotics activity, his status as one of the youthful "leaders" of the "2Fly" gang, plus and an incident that occurred some time between "2008 and 2011" in which the defendant discharged a gun at members of a rival gang after being taunted by them, but nobody was actually harmed (PSR, Paragraphs 8(b), 8 (c), 39, 42).

The Guidelines Offense Level, which is calculated at 31, may be said to be "driven" in this case by the Level 28 for the drug computation, plus an additional two points for weapons possession and 4 points for "leadership". The loosely-dated shooting incident, which is denominated in guidelines terminology as an "aggravated assault", does not increase the overall computation due to the rules of aggregating offenses (PSR, Paragraphs 56-65). The recommended guidelines range of 151 to 188 months imprisonment, which exceeds the range of 135 to 168 stated in the plea agreement (which did not contemplate the additional criminal history points attributable to the juvenile offense), is also driven by the criminal history Category IV which, as previously stated, includes offenses, including the juvenile offense, that are "relevant conduct" under Application Note 4 of USSG 2E1.1, even though, in this case, the defendant's participation in the conspiracy ended some 6 years ago, when the defendant was incarcerated at age 18 under a State Prison Sentence, which he has been serving ever since. Significantly, as noted in the PSR, "his criminal history category may over-represent the seriousness of his criminal history", since without this quirk in the guidelines his guidelines range would be 108 to 135 months (PSR, Page 38).

It is also important to note at this juncture that New York State records in our possession reflect that the defendant was remanded without bail upon his arrest in 2011, and on September 23, 2013, he was sentenced in Bronx Supreme Court to a definite term of imprisonment of six (6) years, with a "Maximum Expiration Date" of April 8, 2017 and a "Conditional Release Date" of May 26, 2016. We contacted the New York State Department of Correctional Services (DOCCS) and were informed that since their records indicate that his sentence included 5 years of post-release supervision, he remains subject to their detainer; therefore he cannot be released until he is returned to State custody for a calculation of his sentence.

It seems clear that since, under Second Circuit law, "a term is 'discharged' when he is released [from state custody]", United States v. Hill, 2012 WL 181594 (2d Cir. 2012), the defendant is still subject to an "undischarged term of imprisonment" for which he must be credited here under USSG 5G1.3(b)(1). This is consistent with the plea agreement in this case which specifically references said guideline and, which states that the sentence here should be imposed concurrently with any remaining portion of the State sentence under USSG 5G1.3(b)(2). The Court may add additional time consecutively, which the Probation Department here recommends to be 60 months (PSR Page 36, 38), but should in any case consider the prior undischarged term in order to "achieve a reasonable punishment for the instant offense" (USSG 5G1.3 (c); PSR, Paragraph 127).

We respectfully submit that Probation's recommendation of an additional 60 months imprisonment exceeds the 3553(a) standard of "sufficient, but not greater than necessary" in this instance because of the some very unique factors in this case. Here, the Court's duty in arriving at an appropriate sentence involves a more structured intellectual exercise than in the ordinary case, to wit, what must be applied here is in part a *retrospective* analysis to comply with the purposes of sentencing with regard to the defendant before the court who was, prior to more than six years in State Prison, a troubled youth, no more than a teenager, with intellectual deficits, who had been in some form of mental health treatment since age 11 and who committed crimes as a gang member/leader during a time in which what remained of his judgment was seriously compromised by his impoverished surroundings, lack of male role models and serious drug and alcohol usage.

While the Court should apply a measure of sympathy when looking at Mr. Bent retrospectively, there is also the need for a *prospective* analysis, which may be said to involve peering into the future to determine how much additional incarceration, if any, is necessary to comply with Section 3553(a). But the prospective analysis here is also far from the ordinary. This once-youthful defendant has been incarcerated for 6 years in State custody and has done well, continually taking advantage of programs to work and improve himself in State Prison (PSR, Paragraphs 107, 117-118). During this time, he has matured and come to terms with his upbringing and deficits (PSR, Paragraphs 89-101), in a way that bodes well for him in the future. As the Probation Department sees it, "The defendant appears to have taken steps to preparing for a productive law-abiding life upon his release from imprisonment" (PSR, Page 38).

Put differently, although we are not asking for a "departure" as such, this six years of growth should be granted serious consideration under 18 US Code 3553(a) becaue it is analogous to "post-arrest rehabilitation". See, United States v. Maier, 975 F. 2d 944 (948-49 (2d Cir. 1992) or "post-sentencing rehabilitation". See, Pepper v. United States, 562 U.S. 476, 131 S.Ct. 1229 (2011).

Mr. Bent has informed us that early on during his incarceration he rejected an attempted visit at Rikers' Island from his present co-defendant Robert Pope, and then telephoned another co-defendant, Emile Anderson, a close friend since the first grade, and told him to broadcast on speaker phone to any others that were present that he was "not 2fly no more". Thereafter, he did not receive any visits from other members of the gang, nor did they provide their former "leader" with any funds for his commissary or for his phone calls while in prison. The only one to visit him during his entire six-year incarceration was Anderson.

As he approached his release date from State Prison in April of this year, Andre planned to marry his fiancee, Kenisha Singleton, get himself a job, and be a father to his children. There is a high likelihood he would have done so. Now he faces a far more uncertain future, which includes an immigration detainer and the probable banishment it entails to Jamaica a country he has never known. It is our view that under the circumstances here the main sentencing objective in this case should be what is commonly referred to as "general deterrence", and that in this case given his young age at the time of the crime and the time he has already served and served beneficially, such objective is satisfied by an additional sentence of less than 60 months.

4

       One logical way to look at this case is to assume based upon common experience that had he been sentenced over six years ago in Federal Court as a teenager, his sentence would likely have approximated 120 months, for which he would expect to be released after serving slightly more than 100 months. Here, he has already served 77 months on a definite sentence without calculating any "good time". Under our premise, an additional 36 months would constitute a reasonable sentence here. It would certainly neatly within the 108 to 135 month guidelines noted by the Probation Department had the Criminal History Category not have been inflated as has previously noted (PSR, Page 38), and, as we hope we have shown, satisfied the purposes of sentencing. That is our recommendation.

Very truly yours,

Bennett M. Epstein

cc. Rachel Maiman, Esq.
    Assistant U.S. Attorney